**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF MISSOURI**
**EASTERN DIVISION**

STATE OF NEBRASKA,
STATE OF MISSOURI,
STATE OF ARKANSAS,
STATE OF IOWA,
STATE OF KANSAS, and
STATE OF SOUTH CAROLINA,

     *Plaintiffs,*

v.

JOSEPH R. BIDEN, JR.,
in his official capacity as the President of the
United States of America;

MIGUEL CARDONA, in his official capacity
as Secretary, United States Department of
Education; and

UNITED STATES DEPARTMENT OF
EDUCATION,

     *Defendants.*

No. _____

## COMPLAINT

1.     The economy is not well. Per the last report from the Bureau of Labor Statistics, inflation has eroded the livelihood of the working class, with real average hourly earnings (*i.e.*, the purchasing power of those wages) down 3.4 percent from last year. *Real Earning Summary*, U.S. Bureau of Labor Statistics (Sept. 13, 2022), https://tinyurl.com/bddwnj6d. Drilling into the numbers illustrates how bad it is. From August 2021 to August 2022—the latest numbers available—the cost of food has gone up 11.4 percent, with the price of groceries increasing 13.5 percent. *Consumer Price Index Summary*, U.S. Bureau of Labor Statistics (Sept. 13, 2022),

https://tinyurl.com/yxcdu3dd.  Likewise, gas is up 25.6 percent, and electricity is up 15.8 percent. *Id.*

2.     And there is no sign of relief.  On September 21, 2022, the Federal Reserve Board and Bank presidents projected that the unemployment rate would increase over the next year.  *See Summary of Economic Projections*, Federal Reserve Bank, at 2 tlb.1 (Sept. 21, 2022), https://tinyurl.com/ycxkvn52.  And inflation, the Federal Reserve projects, is likely to be above 5 percent for this year while the economy struggles along with barely a pulse.  *See id.* (looking at PCE inflation and projected real GDP growth of 0.2 percent).

3.     The burden of the economic loss and price increases will hit those who can least afford it—the working class and the poor.  *See, e.g.*, Jack Kelly, *Inflation Will Wreak Havoc on the Working Class*, Forbes (July 24, 2022), https://tinyurl.com/y83v6xwu.  The well-off, however, can handle the hardship.  For example, "Jordan Trevino, 28, who recently took a better paying job in advertising in Los Angeles with a $100,000 salary, is economizing in little ways—ordering a cheaper entree when out to dinner, for example.  But he is still planning a wedding next year and a honeymoon in Italy."  Jeanna Smialek & Ben Casselman, *In an Unequal Economy, the Poor Face Inflation Now and Job Loss Later*, N.Y. Times (Aug. 11, 2022), https://tinyurl.com/yhfp9tdy.

4.     In the face of out-of-control inflation, job loss, and recession, the Biden Administration's response is to give Mr. Trevino, and those like him, up to $20,000.

5.     The Administration will do that by cancelling $10,000 to $20,000 of student loan debt for individuals who make less than $125,000 annually, or $250,000 annually for a married person filing jointly.  The Administration announced this Mass Debt Cancellation on August 24, 2022.

6.     The majority of the Mass Debt Cancellation will "accrue[ ] to the debt borrowers in

the top 60 percent of the income distribution." *Forgiving Student Loans: Budgetary Costs and Distributional Impact*, Penn Wharton University of Pennsylvania (Aug. 23, 2022), https://tinyurl.com/vpwkes2n.  And none of the benefit will accrue to those who worked and paid their debt.

7.      In addition to being economically unwise and downright unfair, the Biden Administration's Mass Debt Cancellation is yet another example in a long line of unlawful regulatory actions.   No statute permits President Biden to unilaterally relieve millions of individuals from their obligation to pay loans they voluntarily assumed.    Just months ago, the Supreme Court warned federal agencies against "asserting highly consequential power beyond what Congress could reasonably be understood to have granted" by statute. *West Virginia v. EPA*, 142 S. Ct. 2587, 2609 (2022).  Yet the Administration's Mass Debt Cancellation does precisely that.   Determined to pursue across-the-board debt cancellation and stymied by repeated failures to achieve that goal through legislation, the Administration resorted to a federal law whose purpose is to provide relief to individuals who have suffered from an emergency like the 9/11 terrorist attacks or who must serve their country overseas in the military.

8.      That law—known as the Higher Education Relief Opportunities for Students Act of 2003 (HEROES Act)—had previously been used by the Department of Education (ED) to relieve active-duty personnel from nettlesome bureaucratic constraints by waiving various administrative requirements such as grace periods and documentation requirements that might complicate service in active operations.  It is inconceivable, when it passed the HEROES Act, that Congress thought it was authorizing anything like the Administration's across-the-board debt cancellation, which will result in around half a trillion dollars or more in losses to the federal treasury. *See The Biden Student Loan Forgiveness Plan: Budgetary Costs and Distributional Impact*, Penn Wharton

University of Pennsylvania (Aug. 26, 2022), https://tinyurl.com/4y9rz8w5 [Penn Report].

9.      In fact, until now, no one thought that such a power lurked within the HEROES Act, or any other existing federal law.  House Speaker Nancy Pelosi declared categorically: "People think that the President of the United States has the power for debt forgiveness.  He does not. … That has to be an act of Congress. … The President can't do it.  So that's not even a discussion."  Lauren Camera, *Pelosi: Biden Lacks Authority to Cancel Student Debt*, U.S. News & World Report (July 28, 2021), https://tinyurl.com/33ex63de.  And ED previously concluded that the HEROES Act is not a hidden source of authority to cancel student debt.  *See* Memorandum from Reed Rubinstein, Principal Deputy General Counsel, Department of Education, to Betsy DeVos, Secretary of Education 6 (Jan. 12, 2021), https://tinyurl.com/3kp29ys6 [2021 DeVos Memo].

10.      Speaker Pelosi and the 2021 DeVos Memo are right.  The HEROES Act allows the Secretary of Education "to waive or modify any statutory or regulatory provision applicable to" certain student financial assistance programs "in connection with a war or other military operation or national emergency" to protect those negatively affected by the operation or emergency.  Pub. L. No. 108-76, 117 Stat. 904 (codified at 20 U.S.C. § 1098bb(a)(1)).  It is not an across-the-board get-out-of-debt provision that an administration can invoke at will.

11.      Even if the HEROES Act could permit *some* discharge of student loan debt, the Administration itself recognized in an Office of Legal Counsel (OLC) opinion that any waiver or modification under the Act must be (1) "structured to put loan recipients back into the financial position they would be in were it not for the national emergency" and (2) limited only to the harm that has a relation to the borrower's federal loans, "no matter how much financial harm a borrower may have suffered because of a national emergency."  OLC August 23, 2022 Memorandum

Opinion at 21, https://tinyurl.com/2s3k238w [2022 OLC Memo]. The Biden Administration's Mass Debt Cancellation does not even attempt to meet these requirements. It instead justifies relief for all borrowers whose debt the Administration holds based on talismanic reference to the COVID-19 pandemic. It makes no difference to the Administration's cancellation whether the pandemic rendered a borrower better or worse off or how much financial harm the borrower suffered in relation to her loans. Thus, the Mass Debt Cancellation is not remotely tailored to address the effects of the pandemic on federal student loan borrowers, as required by the HEROES Act. The Mass Debt Cancellation instead disregards the Act's objectives and express requirements and distorts the Act beyond recognition in the service of the Administration's political agenda on student loans. It is the epitome of unlawful and arbitrary agency action, and it should be set aside.

## THE PARTIES

12. Plaintiff State of Nebraska is a sovereign State of the United States of America. Nebraska sues to vindicate its sovereign, quasi-sovereign, financial, and proprietary interests.

13. Douglas J. Peterson is the Attorney General of Nebraska. Attorney General Peterson is authorized to bring legal actions on behalf of the State of Nebraska and its citizens.

14. Plaintiff State of Missouri is a sovereign State of the United States of America. Missouri sues to vindicate its sovereign, quasi-sovereign, financial, and proprietary interests.

15. Eric S. Schmitt is the 43rd Attorney General of the State of Missouri. Attorney General Schmitt is authorized to bring actions on behalf of Missouri that are "necessary to protect the rights and interests of the state, and enforce any and all rights, interests, or claims any and all persons, firms or corporations in whatever court or jurisdiction such action may be necessary." Mo. Rev. Stat. § 27.060.

16. Plaintiff State of Arkansas is a sovereign State of the United States of America.

Arkansas sues to vindicate its sovereign, quasi-sovereign, financial, and proprietary interests.

17. Leslie Rutledge is the Attorney General of Arkansas. General Rutledge is authorized to "maintain and defend the interests of the state in matters before the United States Supreme Court and all other federal courts." Ark. Code Ann. 25-16-703.

18. Plaintiff State of Iowa is a sovereign State of the United States of America. Iowa sues to vindicate its sovereign, quasi-sovereign, financial, and proprietary interests.

19. The Attorney General of Iowa of Iowa is authorized and required to prosecute legal actions on behalf of the State of Iowa and its citizens when requested to do so by the Governor. *See* Iowa Code § 13.2(1)(b).

20. Plaintiff State of Kansas is a sovereign State of the United States of America. Kansas sues to vindicate its sovereign, quasi-sovereign, proprietary, and *parens patriae* interests.

21. Derek Schmidt is the Attorney General of Kansas. Attorney General Schmidt is authorized to bring legal actions on behalf of the State of Kansas and its citizens.

22. Plaintiff State of South Carolina is a sovereign State of the United States of America. South Carolina sues to vindicate its sovereign, quasi-sovereign, financial, and pro-prietary interests.

23. Alan Wilson is the Attorney General of South Carolina. Attorney General Wilson is authorized to bring legal actions on behalf of the State of South Carolina and its citizens.

24. Defendants are officials of the United States government and United States governmental agencies responsible for implementing the Mass Debt Cancellation.

25. Defendant Joseph R. Biden, Jr. is the President of the United States of America. He is sued in his official capacity.

26. Defendant Miguel Cardona is the Secretary of Education. He is sued in his official capacity.

27. Defendant United States Department of Education (ED) is an agency of the United States government, located at 400 Maryland Avenue, S.W., Washington, D.C. 20202.

## JURISDICTION AND VENUE

28. This Court has jurisdiction pursuant to 5 U.S.C. §§ 702-703 and 28 U.S.C. §§ 1331, 1361, and 2201.

29. This Court is authorized to award the requested declaratory and injunctive relief under 5 U.S.C. §§ 702 and 706, 28 U.S.C. §§ 1361 and 2201-2202, and its inherent equitable powers.

30. Venue is proper in this district pursuant to 28 U.S.C. §§ 1391(b)(2) and 1391(e). Defendants are United States agencies or officers sued in their official capacities. Plaintiff State of Missouri is a resident of this judicial district, and a substantial part of the events or omissions giving rise to the Complaint occur within this district.

31. The Plaintiff States bring this action to redress harms to their sovereign, quasi-sovereign, financial, and proprietary interests, including their interests under 5 U.S.C. § 702 and 41 U.S.C. § 1707.

## FACTUAL ALLEGATIONS

### The Decade-Long Political Push For Student-Loan Debt Cancellation

32. In September 2011, the Occupy Wall Street movement began. Out of that movement grew the Occupy Student Debt Campaign, which encouraged borrowers to default on student-loan payments as a form of protest. Amanda M. Fairbanks, *Occupy Student Debt Campaign Announces Nationwide Loan Refusal Pledge*, Huffington Post (Nov. 11, 2011), https://tinyurl.com/sm9upf56. In November 2015, inspired by statements made by Senator Bernie

Sanders, students at over one hundred college campuses staged a walk-out to protest the cost of college in the "Million Student March." Danielle Douglas-Gabriel, *Million Student March Fights for Debt-Free College*, Wash. Post (Nov. 12, 2015), https://tinyurl.com/bdutx2ns. The students "demand[ed] … the cancellation of all student debt." *Id.* The next year, ED established a pathway to cancel loans for students defrauded by for-profit colleges. Anya Kamenetz & Kirk Carapezza, *A Path 'To Debt Relief' For Defrauded Corinthian Students*, NPR (Mar. 25, 2016), https://tinyurl.com/2p8y9ycf.

33.    In 2018, one commentator predicted that "come 2020, at least one major Democratic candidate for president is going to campaign on outright canceling a boatload of student debt" because "student debt forgiveness is really, really popular among Democrats." Jordan Weissmann, *Student Debt Forgiveness Is Really, Really Popular Among Democrats*, Slate (Nov. 18, 2018), https://tinyurl.com/yyvss2ba (capitalization altered). In April 2019, Senator Elizabeth Warren announced a proposal for student-debt cancellation, stating that her "plan for broad student debt cancellation" would "[c]ancel debt for more than 95% of the nearly 45 million Americans with student loan debt" and "[w]ipe out student loan debt entirely for more than 75% of the Americans with that debt." Elizabeth Warren, *I'm Calling For Something Truly Transformational: Universal Free Public College And Cancellation Of Student Loan Debt*, Medium (Apr. 22, 2019), https://tinyurl.com/mrxy3arr.

34.    In June 2019, Senator Sanders announced his own proposal to "[c]ancel all student loan debt for the [approximately] 45 million Americans who owe about $1.6 trillion and place a cap on student loan interest rates going forward at 1.88 percent." Bernie Sanders, *College for All and Cancel All Student Debt*, https://tinyurl.com/yu8r4avy (last visited Sept. 28, 2022).

35.    In April 2020, then-candidate Biden announced a proposal to "forgive all

undergraduate tuition-related federal student debt from two- and four-year public colleges and universities for debt-holders earning up to $125,000, with appropriate phase-outs to avoid a cliff." Joe Biden, *Joe Biden Outlines New Steps to Ease Economic Burden on Working People*, Medium (Apr. 9, 2020), https://tinyurl.com/3cbw4zh2 [Biden Medium Article]. He did not suggest that his proposal had anything to do with the COVID-19 pandemic, which was well underway by April 2020.

### Background of Relevant Student Loan Programs

36.     The Higher Education Act (HEA) establishes several student-loan programs. The two that are the most relevant to this lawsuit are the Direct Loan Program (DLP) and Federal Family Education Loan Program (FFELP). 20 U.S.C. §§ 1071 *et seq*., 1087a *et seq*.

37.     The origination of new FFELP loans stopped on July 1, 2010. But many FFELP loans still exist and are subject to ongoing repayment.

38.     There are entities, some of which are state instrumentalities, that service FFELP loans and generate revenue from that servicing work. There are also entities, some of which are state instrumentalities, that hold FFELP loans and earn income from the interest payments on those loans. And there are investors, some of which are state agencies, that invest in student-loan asset-backed securities (SLABS) secured by FFELP loans. SLABS are FFELP loans bundled, rated, and sold in tranches to institutional investors as bonds.

39.     All student loans originating under the HEA beginning on July 1, 2010, have been, and in the future will be, originated under the DLP.

40.     There are entities, some of which are state instrumentalities, that service DLP loans and generate revenue from that servicing work.

41.     Student-loan borrowers may consolidate FFELP loans into DLP loans. *See* 34

C.F.R. § 685.220 (providing the criteria for consolidation). Such a direct consolidation loan comes "at no cost" to the borrower. *Direct Consolidation Loan Application*, Federal Student Aid, https://tinyurl.com/bdfhxser (last visited Sept. 28, 2022).

42. The HEA and its implementing federal regulations provide a comprehensive legal framework governing federal student loan assistance and borrowers' obligations to repay their loans, including how and when certain loan statuses qualify for income-driven repayment (IDR) and Public Service Loan Forgiveness (PSLF).

43. The HEA sets forth the "[t]erms and conditions" of DLP loans, including the "[r]epayment plan for public service employees" and "income-based repayment plan." 20 U.S.C. § 1087e.

44. Federal regulation also specifies the conditions under which "[a] borrower may obtain loan forgiveness under [the FFELP] program," 34 C.F.R. § 685.219(c), and under which a borrower "qualif[ies] for loan forgiveness" under the IDR program, *id*. § 685.221(f).

45. While the HEA includes a variety of provisions allowing the Secretary to promulgate regulations for income-driven repayment and other repayment programs, no provision of the HEA authorizes the Secretary to implement a mass cancellation of student-loan debt.

**ED's, The Biden Administration's, And Speaker Pelosi's Recognition That Student-Debt Cancellation Via Unilateral Executive Action Is Unlawful**

46. On January 12, 2021, ED published a memorandum concluding that mass student-loan debt cancellation could not be accomplished through executive action. *See* 2021 DeVos Memo, *supra*, at 4, 6. ED noted that it "has never relied on the HEROES Act or any other statutory, regulatory, or interpretative authority for the blanket or mass cancellation … of student loan principal balances, and/or the material change of repayment amounts or terms." *Id.* at 6.

47. In July 2021, Speaker Pelosi stated at a press conference: "People think that the

President of the United States has the power for debt forgiveness. He does not. He can postpone. He can delay. But he does not have that power. That has to be an act of Congress. … The President can't do it. So that's not even a discussion." Camera, *supra*.

48.     Though President (then-candidate) Biden expressed support for cancelling federal student-loan debt in April 2020, *see* Biden Medium Article, *supra*, it appears that he eventually came to agree with Speaker Pelosi. When asked about student-loan cancellation in November 2020, President-elect Biden responded by citing proposed legislation that would cancel student debt rather than discussing executive action. Adam Looney, *Biden Shouldn't Listen to Schumer and Warren on Student Debt*, Brookings (Nov. 18, 2020), https://tinyurl.com/bdew8ufr. In October 2021, White House Press Secretary Jen Psaki reiterated that "[i]f Congress wanted to pass and send the president a bill to cancel $10,000 in student debt, he'd happily sign it." Zack Friedman, *Biden Ready To Sign Student Loan Forgiveness, But Congress Hasn't Passed Any Legislation*, Forbes (Oct. 5, 2021), https://tinyurl.com/bdfxkyfp. These comments indicate that President Biden thought mass student loan cancellation must come through Congress.

**The Failure of Proposed Legislation to Enact Student-Debt Cancellation**

49.     Despite the Biden Administration's invitation, attempts to enact legislation cancelling student-loan debt have repeatedly failed.

50.     In July 2019, Senator Warren introduced the Student Loan Debt Relief Act of 2019, a bill that would have automatically canceled $50,000 of student loan debt for those who make under $100,000. The bill failed. *See* Student Loan Debt Relief Act of 2019, S. 2235, 116th Cong. (2019).

51.     In March 2021, Representative Al Lawson introduced the Income-Driven Student Loan Forgiveness Act, which would have cancelled the outstanding balance on loans for all

borrowers under a certain income cap. *See* Income-Driven Student Loan Forgiveness Act, H.R. 2034, 117th Cong. (2021). The bill failed.

52. In February 2021, Senators Warren and Chuck Schumer and Representatives Alma Adams, Ilhan Omar, and Mondaire Jones introduced a resolution asserting that the Biden Administration has statutory power to cancel student debt immediately. Elizabeth Warren, *Warren, Schumer, Pressley, Colleagues: President Biden Can and Should Use Executive Action to Cancel up to $50,000 in Federal Student Loan Debt Immediately* (Feb. 4, 2021), https://tinyurl.com/8wpkedd9.

### ED's Multiple Efforts To Prevent COVID-19 From Placing Borrowers In A Worse Position Financially

53. On March 20, 2020, in light of the COVID-19 pandemic, ED waived student-loan interest for three months and gave borrowers the option to suspend principal payments for two months for federally held student loan debt. *Delivering on President Trump's Promise, Secretary DeVos Suspends Federal Student Loan Payments, Waives Interest During National Emergency*, U.S. Department of Education (Mar. 20, 2020), https://tinyurl.com/yc3yxs4y. Secretary Betsy DeVos stated that "[r]ight now, everyone should be focused on staying safe and healthy, not worrying about their student loan balance growing." *Id.*

54. On March 27, 2020, President Trump signed the Coronavirus Aid, Relief, and Economic Security (CARES) Act, which extended the student-loan pause through September 30, 2020. *See CARES Act Student Loan Fact Sheet*, NCSL (Mar. 30, 2020), https://tinyurl.com/yprmp39d. The Trump and Biden Administrations then repeatedly extended the student-loan pause, which is currently scheduled to conclude on December 31, 2022. *See, e.g.*, Donald J. Trump, *Memorandum on Continued Student Loan Payment Relief During the COVID-19 Pandemic* (Aug. 8, 2020), https://tinyurl.com/2p8sjrs4. President Trump stated that the pause

"has helped many students and parents retain financial stability." *Id.*

55. In October 2021, ED announced "transformational changes" to the PSLF program. *Department of Education Announces Transformational Changes to the Public Service Loan Forgiveness Program, Will Put Over 550,000 Public Service Workers Closer to Loan Forgiveness*, U.S. Department of Education (Oct. 6, 2021), https://tinyurl.com/63y4x2ux; *PSLF Waiver Offers Way to Get Closer to Loan Forgiveness*, Federal Student Aid, https://tinyurl.com/38tbtxcm (last visited Sept. 28, 2022) [October 2021 PSLF Announcement]. ED later stated that this "[r]evamping" of the PSLF program resulted in loan relief for approximately 100,000 borrowers. *Biden-Harris Administration Extends Student Loan Pause Through August 31*, U.S. Department of Education (Apr. 6, 2022), https://tinyurl.com/mr4b7udf [ED April 6 Press Release]. ED acknowledged that it "change[d]" the "[n]ormal … [r]equirements" and invoked purported "flexibilities provided by the HEROES Act" to justify this departure from the HEA's framework. October 2021 PSLF Announcement, *supra*.

56. In April 2022, ED announced additional actions to provide loan cancellation to borrowers through the PSLF program and IDR plans, which it estimated would result in debt cancellation for more than 40,000 borrowers and credit toward IDR cancellation for millions more. *Department of Education Announces Actions to Fix Longstanding Failures in the Student Loan Programs*, U.S. Department of Education (Apr. 19, 2022), https://tinyurl.com/pju4nmxf [April 2022 Press Release]. On information and belief, because of those changes, service providers already have seen a dramatic increase in applications and inquiries for DLP consolidations in recent months.

### The Administration's Pretextual Reliance On The Fading Pandemic to Justify Mass Debt Cancellation

57. In April 2022, the Biden Administration terminated an earlier order that had

suspended the introduction of migrants into the United States based on concerns related to the COVID-19 pandemic. *CDC Public Health Determination and Termination of Title 42 Order*, Centers for Disease Control and Prevention (Apr. 1, 2022), https://tinyurl.com/23cp257r. "After considering current public health conditions and an increased availability of tools to fight COVID-19," the Administration wrote, it had determined that the limitation on migration was "no longer necessary." *Id*. The Administration cited "the current public health landscape where 97.1% of the U.S. population lives in a county identified as having 'low' COVID-19 Community Level." *Id*. The Administration asserted in court that "after peaking on January 15, 2022, COVID-19 case numbers in the United States fell by 95% as of March 28, 2022," and "[d]eath and hospitalization rates also underwent a 'swift descent.'" Mem. Opp'n Pls' Mot. Prelim Inj. at 8, *Arizona v. CDC*, No. 6:22-cv-00885 (W.D. La. Apr. 29, 2022), ECF No. 40. In short, the Administration observed, "the pandemic 'ha[d] shifted to a new phase.'" *Id*.

58.     More recently, in a September 18, 2022 interview with 60 Minutes, President Biden was more definitive about the state of the pandemic, declaring that "[t]he pandemic is over." 60 Minutes (@60Minutes), Twitter (Sept. 18, 2022), https://tinyurl.com/2s35maau.

59.     In between those two events declaring the COVID pandemic over—that is, in August 2022—ED invoked the pandemic to justify its Mass Debt Cancellation.

60.     On August 24, 2022, the Administration announced that it will cancel $10,000 to $20,000 in student debt for all borrowers who have loans owned by ED and whose annual income during the pandemic was less than $125,000 (or $250,000 for married borrowers who file jointly). *FACT SHEET: President Biden Announces Student Loan Relief for Borrowers Who Need It Most*, The White House (Aug. 24, 2022), https://tinyurl.com/2p8zmh2b. Borrowers who received a Pell Grant are eligible for $20,000 in loan cancellation, and borrowers who did not receive a Pell Grant

are eligible for $10,000 in cancellation.  *Id.*

61.     The Administration estimates that "over 40 million borrowers are eligible" for the Mass Debt Cancellation.  *FACT SHEET: The Biden-Harris Administration's Plan for Student Debt Relief Could Benefit Tens of Millions of Borrowers in All Fifty States*, The White House (Sept. 20, 2022), https://tinyurl.com/ekrbnvn4.

62.     DLP loans qualify for loan cancellation.  *One-Time Student Loan Debt Relief*, FEDERAL STUDENT AID, https://tinyurl.com/yc7bban8 (last visited Sept. 28, 2022) [Cancellation Program Webpage].  So do FFELP "loans held by ED."  *Id.*

63.     In addition, FFELP borrowers who consolidate their privately held loans into DLP loans are also eligible for loan cancellation.  Cancellation Program Webpage, *supra*.  In fact, the Department is explicitly instructing "borrowers with privately held federal student loans" including FFELP loans that they "can receive this relief [cancellation] by consolidating these loans into the Direct Loan program [DLP]."  *Id.*

64.     ED has announced that many DLP borrowers—an estimated eight million of them—will receive cancellation "automatically because relevant income data is already available" to ED.  *The Biden-Harris Administration's Student Debt Relief Plan Explained*, Federal Student Aid, https://tinyurl.com/msj29rdx (last visited Sept. 28, 2022) [Cancellation FAQs] ("[T]here are 8 million people for whom we have data and who will get the relief automatically.").  For borrowers whose income data is not available to ED, the Administration will release a loan cancellation application in early October.  *Id.*

65.     Under the Mass Debt Cancellation, eligible borrowers who made payments on their debt during the pandemic will automatically have those payments refunded to them.  Cancellation Program Webpage, *supra* ("You will automatically receive a refund of your payments during the

payment pause if: you successfully apply for and receive debt relief under the Administration's debt relief plan, AND your voluntary payments during the payment pause brought your balance below the maximum debt relief amount you're eligible to receive but did not pay off your loan in full."). ED has advised its loan servicers that borrowers do not have to state that their refund request is specifically due to COVID-19. The number of refunds requested and processed since ED announced the Mass Debt Cancellation has risen precipitously.

66. The Wharton School of the University of Pennsylvania released a study concluding that ED's Mass Debt Cancellation alone will cost up to $519 billion over ten years, and the overall cost could rise to more than $1 trillion when factoring in the other components of ED's announcement. *See* Penn Report, *supra*.

67. In a legal memorandum accompanying the Mass Debt Cancellation, ED revoked its previous legal analysis of the issue and asserted that the HEROES Act allows it to effectuate a program of "loan cancellation directed at addressing the financial harms of the COVID-19 pandemic." *Notice of Debt Cancellation Legal Memorandum*, 87 Fed. Reg. 52,943, 52,944 (Aug. 30, 2022). ED further claimed that it is "not required to … show that any individual borrower is entitled to a specific amount of relief" and "instead may provide relief on a categorical basis." *Id*.

68. The HEROES Act provides that ED, acting through the Secretary, may "waive or modify any statutory or regulatory provision applicable to [certain] student financial assistance programs" when "necessary in connection with a war or other military operation or national emergency." 20 U.S.C. § 1098bb(a)(1). The Act further specifies, as relevant here, that this waiver or modification must be "necessary to ensure that" one of certain statutory objectives is achieved, including to ensure that "recipients of student financial assistance … who are affected individuals are not placed in a worse position financially in relation to that financial assistance

because of their status as affected individuals." § 1098bb(a)(2)(A). The Act defines "affected individuals" as including people who (1) "reside[] or [are] employed in an area that is declared a disaster area by any Federal, State, or local official in connection with a national emergency" or (2) "suffered direct economic hardship as a direct result of a war or other military operation or national emergency, as determined by the Secretary." § 1098ee(2)(C)–(D).

69. The HEROES Act, which was passed during the Iraq War and military operations in Afghanistan, codifies its purpose in its preamble: "To provide the Secretary of Education with *specific* waiver authority to respond to a war or other military operation or national emergency." Pub. L. No. 108-76, 117 Stat. 904 (emphasis added). Its purpose is further reflected in its "Findings" section:

> The Congress finds the following:
>
> (1) There is no more important cause than that of our nation's defense.
>
> (2) The United States will protect the freedom and secure the safety of its citizens.
>
> (3) The United States military is the finest in the world and its personnel are determined to lead the world in pursuit of peace.
>
> (4) Hundreds of thousands of Army, Air Force, Marine Corps, Navy, and Coast Guard reservists and members of the National Guard have been called to active duty or active service.
>
> (5) The men and women of the United States military put their lives on hold, leave their families, jobs, and postsecondary education in order to serve their country and do so with distinction.
>
> (6) There is no more important cause for this Congress than to support the members of the United States military and provide assistance with their transition into and out of active duty and active service.

20 U.S.C. § 1098aa(b). The sole focus of these findings is ensuring relief for "members of the United States military."

70. The day of the White House announcement, OLC released a memo asserting that the HEROES Act grants the Secretary authority to "reduce or eliminate the obligation to repay the

principal balance of federal student loan debt, including on a class-wide basis in response to the COVID-19 pandemic." 2022 OLC Memo, *supra*, at 1.

71.     OLC observed that, under the Act, a waiver or modification "would be permissible only as may be necessary to ensure the individuals are not placed in a 'worse position financially ... *because of*'" their status as affected individuals. 2022 OLC Memo, *supra*, at 20 (citing 20 U.S.C. § 1098bb(a)(2)(A)). According to OLC, this requires ED to "determine that the COVID-19 pandemic was a but-for cause of the financial harm" to be addressed by any mass debt cancellation. *Id.* at 21.

72.     On information and belief, the Biden Administration has not made a determination that the pandemic was a but-for cause of any financial harm addressed by the Mass Debt Cancellation.

73.     OLC also considered the Act's requirement that any waiver and modification "be necessary" to "ensure" that affected individuals "*are not placed in a worse position financially in relation to that financial assistance* because of their status as affected individuals." 20 U.S.C. § 1098bb(a)(2) (emphasis added). OLC read this requirement to mean that any waiver or modification should "put loan recipients back into the financial position" they would have held in relation to their loans "were it not for the national emergency." 2022 OLC Memo, *supra*, at 21.

74.     On information and belief, the Biden Administration has not made a determination that the Mass Debt Cancellation will put borrowers back in the financial position they would have been in if not for the COVID-19 pandemic.

75.     Having defined the Act's criteria for waiver or modification, OLC analyzed whether "within these parameters" ED is authorized to implement mass debt cancellation. 2022 OLC Memo, *supra*, at 21. OLC concluded that ED need not proceed "case-by-case" under the Act

18

and is allowed to "minimize 'administrative requirements.'"  *Id.* at 23.  But OLC did not reach a firm conclusion about the legality of mass debt cancellation, stating only that affording "broad, categorical" debt cancellation "*could be* an appropriate invocation of the Act."  *Id.* at 21 (emphasis added).

### The White House Announces the Mass Debt Cancellation Without Referencing The Pandemic

76.    The White House's public messaging left no doubt that the Mass Debt Cancellation reflected policy goals that had no real connection to the pandemic.  A senior administration official explained during a press briefing after ED announced its Mass Debt Cancellation that President Biden had "promised to provide targeted student debt relief" "[d]uring the [2020 presidential] campaign" and was now "following through on that promise."  *Background Press Call by Senior Administration Officials on Student Loan Relief*, The White House (Aug. 24, 2022), https://tinyurl.com/9a85ehn5 [Cancellation Backgrounder].

77.    Later in the briefing, the same official emphasized that ED's Mass Debt Cancellation is intended to "narrow the racial wealth gap," "promot[e] equity," allow more Americans to obtain "a ticket to a middle-class life" through "post-high school education," and address education costs that have been rising "[o]ver the last 40 years."  Cancellation Backgrounder, *supra*.  The official did not mention the COVID-19 pandemic.  *Id.*

78.    These statements are in line with ED's earlier pronouncements related to student-debt cancellation during the pandemic.  In its April 19 press release, for example, ED explained that its actions are designed to "address[] historical failures in the administration of the federal student loan programs," and that its actions "will begin to remedy years of administrative failures that effectively denied the promise of loan forgiveness to certain borrowers."  April 2022 Press Release, *supra*.

**The HEROES Act Does Not Authorize the Mass Debt Cancellation**

79.     ED's Mass Debt Cancellation does not accord with the HEROES Act's express requirements for waivers or modifications.   The Act requires ED to tailor any waiver or modification as necessary to address the actual financial harm suffered by a borrower due to the relevant military operation or emergency.   But under ED's Mass Debt Cancellation, every borrower with annual income under $125,000 (or $250,000 for married borrowers filing jointly) during the pandemic gets the same $10,000 in student-loan debt cancelled (or $20,000 if the borrower received a Pell Grant).   This relief comes to every borrower regardless of whether her income rose or fell during the pandemic or whether she is in a better position today as to her student loans than before the pandemic.

80.     The disconnect between ED's Mass Debt Cancellation and the HEROES Act is even greater because ED has already provided substantial relief to pandemic-affected borrowers. In March 2020, ED suspended most borrowers' obligations to make loan payments and stopped interest from accruing on their loans, and that waiver remains in place through the end of 2022. As a result, most borrowers are better off today than before the pandemic with respect to their student loans because they have paid nothing for nearly three years, no interest has accrued on their loans, and rampant inflation has reduced the real-dollar value of their debts.   Since most borrowers during the pandemic missed no payments (because none were due), and most borrowers during the pandemic accrued no interest (because the interest rate has been 0%), and credit reporting bureaus during the pandemic have been reporting student loans as being on time and the underlying loans as being current (acting to increase an individual's credit score), there is no pandemic-caused harm in relation to most borrowers' student loans.   *See* 2022 OLC Memo, *supra*, at 21 (ED can "only … offset that portion of the harm that has a 'relation to' the borrower's [federal] assistance").

81. In fact, 80 percent of all student-loan borrowers saw their credit scores *increase* during the pandemic, with the largest increases among borrowers with delinquent loans at the beginning of the pandemic. Daniel Mangrum, et al., *Liberty Street Economics: Three Key Facts from the Center for Microeconomic Data's 2022 Student Loan Update*, Federal Reserve Bank of New York (Aug. 9, 2022), https://tinyurl.com/59d9j8bp.

82. ED's failure to tie its Mass Debt Cancellation to the HEROES Act's requirements cannot be justified as a matter of administrative convenience. The OLC memo suggests that ED can avoid individualized determinations of economic hardship to minimize "administrative requirements." 2022 OLC Memo, *supra*, at 23–24. But this observation ignores that, even under ED's Mass Debt Cancellation, millions of borrowers will have to submit tax information to the Department to support their individual eligibility for cancellation. In any event, that it is *easier* to give debt cancellation to everyone cannot justify ignoring the express requirements of the HEROES Act.

83. Even if the HEROES Act's text could plausibly be read to accord with ED's Mass Debt Cancellation (and it cannot), the major-questions doctrine precludes ED's invocation of the Act. ED's invocation of the Act is a quintessential effort to discover "an unheralded power" representing a "transformative expansion in [its] regulatory authority." *West Virginia*, 142 S. Ct. at 2610.

84. Until now, ED has "generally invoked the HEROES Act relatively narrowly to grant relief to limited subsets of borrowers, such as deployed military service members or victims of certain natural disasters." Kevin M. Lewis & Edward C. Liu, *The Biden Administration Extends the Pause on Federal Student Loan Payments: Legal Considerations for Congress*, Congressional Research Service, at 2–3 (Jan. 27, 2021), https://tinyurl.com/yxwm4eyj. ED "has never relied on

the HEROES Act or any other statutory, regulatory, or interpretative authority for the blanket or mass cancellation … of student loan principal balances, and/or the material change of repayment amounts or terms."  2021 DeVos Memo, *supra*, at 6.

85.     It is evident from ED's own recent statements that the COVID-19 pandemic is mere pretext and a post hoc rationalization for the political goal of mass debt cancellation.

**ED's Mass Debt Cancellation Harms Plaintiff States**

86.     ED's Mass Debt Cancellation harms Plaintiff States' sovereign, quasi-sovereign, financial, and proprietary interests.

87.     These harms, which are explained in detail below, are irreparable.

88.     But for the Mass Debt Cancellation, the harms that are ongoing would not have occurred, and the harms that are imminent will not occur.

89.     Immediate injunctive relief is necessary to stop these injuries.

90.     The balance of the equities favors issuing immediate injunctive relief.

91.     The public interest supports entering an injunction.

**Harms to financial and proprietary interests**

92.     The Mass Debt Cancellation harms the States' financial and proprietary interests.

93.     The Higher Education Loan Authority of the State of Missouri (MOHELA) is "a body politic and corporate" that is "a public instrumentality and body corporate" of the State of Missouri that performs "an essential public function."  Mo. Rev. Stat. § 173.360.

94.     MOHELA's purpose is to ensure that all eligible post-secondary education students in Missouri have access to guaranteed student loans.  Since 2010, MOHELA has provided roughly $100 million in funding for college scholarships in the State of Missouri.

95.     MOHELA is authorized to act as a servicer for student loan debt, *see* Mo. Rev. Stat. § 173.385.1(18), and it may use fees and charges from that activity "to pay the costs of the authority," § 173.385.1(12).

96.     MOHELA is a servicer for federally held student debt, including DLP loans, under contracts with ED.  The amount of federally held student debt MOHELA services is substantial. The entity services roughly $59 billion in federal direct loans representing over 2.7 million accounts, which are primarily DLP loans.

97.     MOHELA is also a servicer of FFELP loans.

98.     MOHELA services loans for borrowers across the nation.

99.     MOHELA is also a holder of FFELP loans.  The entity generates revenue from those outstanding FFELP loans.

100.    The borrowers of the FFELP loans that MOHELA holds live across the U.S.

101.    MOHELA uses the FFELP loans that it holds as security on bond offerings.

102.    The Mass Debt Cancellation is inflicting a number of ongoing financial harms on MOHELA.

103.    As a servicer of DLP loans, MOHELA is enduring injury in the form of compliance costs by undertaking significant efforts to comply with the unlawful Mass Debt Cancellation.

104.    The Mass Debt Cancellation has created an enormous incentive to consolidate FFELP loans not held by ED (which are not currently eligible for cancellation) into DLP loans (which are eligible for cancellation).  The inevitable result is that FFELP loan borrowers will likely consolidate into DLP loans en masse.

105.    The consolidation of MOHELA's FFELP loans harms the entity by depriving it of an asset (the FFELP loans themselves) that it currently owns.

106.     The consolidation of MOHELA's FFELP loans harms the entity by depriving it of the ongoing interest payments that those loans generate.

107.     To the extent MOHELA must invest in other fixed-income assets, *see* Mo. Rev. Stat. §173.385.1(13), using funds that were previously invested in student loan debt, it will be investing in a rising interest rate environment. As a result, any investments it purchases in the near term will drop in value.

108.     The widespread consolidation of FFELP loans into DLP loans decreases the number of FFELP loans on the secondary markets, which—on information and belief—will lower prices for those loans. The drop in value of those loans harms those who hold them, like MOHELA.

109.     The consolidation of MOHELA's FFELP loans harms the entity by depriving them of the ongoing revenue it earns from servicing those loans.

110.     The consolidation of MOHELA's FFELP loans diminishes its ability to issue bonds and access debt markets because the entity uses the income it receives from student loans as security for bond payments.

111.     The Mass Debt Cancellation will also inflict imminent financial harms on MOHELA.

112.     MOHELA faces the imminent loss of revenue in its role as a servicer of DLP loans. MOHELA's revenue as a servicer of DLP loans is a function of the number of accounts it services. So when student loan balances go to zero, as they will en masse under the Mass Debt Cancellation, MOHELA will lose the revenue from servicing those loans.

113.     Depriving MOHELA of the FFELP loans it holds will (1) limit its access to debt markets—by eliminating assets MOHELA may use to secure those bonds, *see* Mo. Rev. Stat.

§§ 173.385.1(6), 173.390—or (2) force the entity to issue a bond resolution providing for repayment of the bonds from some other source, *see id.*

114.    On information and belief, depriving MOHELA of assets like student loan debt and limiting MOHELA's ability to access debt markets limits the entity's ability to ensure that all "postsecondary education students" in the State "have access to student loans that are guaranteed or insured, or both," and its ability to support the State's universities.  Mo. Rev. Stat. § 173.360.

115.    The Arkansas Student Loan Authority (ASLA) is a division of the Arkansas Development Finance Authority.  *See* Ark. Code Ann. 15-5-1902(a)(1).  ASLA is "the instrumentality of the state charged with a portion of the responsibility of the state to provide educational opportunities in keeping with all applicable state and federal laws."  Ark. Code Ann. 15-5-1902(a)(2).  As part of that mission, ASLA provides student loans.

116.    Prior to the Administration's Mass Debt Cancellation, ASLA held approximately $100 million dollars in FFELP loans.  ASLA financed those loans through the issuance of bonds. Interest payments received from borrowers are used to satisfy ASLA's obligations to those bondholders.  ASLA receives a percentage of the outstanding FFELP loan balance each month as an administrative fee.  Revenue from that administrative fee is then used for administrative and servicing costs.

117.    Excess revenue (the administrative fee minus administrative and servicing costs) is used for a number of purposes that further ASLA's mission.  These include: "(1) Making loans; (2) Purchasing loans and security interests in loan participations as authorized; (3) Paying incidental expenses in connection with loans; (4) Paying expenses of authorizing and issuing bonds; (5) Paying interest on bonds until revenues are available in sufficient amounts from the bonds; and (6) Funding reserves as necessary."  Ark. Code Ann. 15-5-1904(c).

118.     The Mass Debt Cancellation is already causing ongoing harm to ASLA's financial interests.  The FFELP loans currently held by ASLA do not qualify for cancellation under the program announced by the Administration.  However, borrowers may consolidate those loans into DLP loans.

119.     ASLA estimates that, since the administration's announcement of the Mass Debt Cancellation, approximately $5-6 million of its FFELP loan holdings have been consolidated by borrowers into DLP loans.  If FFELP loans held by ASLA remain outside of the Mass Debt Cancellation, ASLA expects a continuing and massive reduction in its FFELP loan balance.  Because ASLA's administrative fee is calculated based on the total outstanding balance of its FFELP loans, the Mass Debt Cancellation will result in a significant reduction in the revenue ASLA receives from its FFELP loans.

120.     If the Administration were to change its program and declare FFELP loans eligible for cancellation (such as through direct payments to loan holders like ASLA), ASLA estimates that the vast majority of its borrowers will be eligible for cancellation.  If those borrowers were to receive any such cancellation of their FFELP loans, the revenue ASLA receives through administering the FFELP loans will reduce significantly.  ASLA estimates a reduction of between $11-16 million, depending on future interest rates, in the expected yield of its FFELP loan balances.

121.     The reduction in ASLA revenue caused by the Mass Debt Cancellation will limit its ability to provide education opportunities to Arkansans through financing further student loans.

122.     The Nebraska Investment Council (NIC) is responsible for investing various assets held by the State of Nebraska, including the State's pension fund.

123.     NIC has multiple accounts with money invested in student loan asset-backed

securities (SLABS).

124.     The Mass Debt Cancellation is inflicting ongoing financial harm on NIC.

125.     The widespread consolidation of FFELP loans into DLP loans will cause investors in SLABS to receive money back earlier than anticipated, ending the interest income flow that SLABS generate.

126.     On information and belief, this consolidation will likely cut in half the existing FFELP SLABS market and cause financial injury to NIC.  *See* Carmen Arroyo, *Biden's Student-Loan Relief Plan Stirs a $100 Billion Plus Debt Market*, Bloomberg (Sept. 2, 2022), https://tinyurl.com/43sc7ec4.

127.     Furthermore, when the FFELP loans are pre-paid, the SLABS market declines, which lowers the value of NIC's investments and harms the State of Nebraska, including pensioners throughout the State.

128.     The States of Nebraska, Iowa, Kansas, and South Carolina will also suffer direct pocketbook harms from the Mass Debt Cancellation.

129.     To determine an individual's taxable state income, Nebraska uses the individual's federal adjusted gross income as a baseline.  *See* Neb. Rev. Stat. § 77-2714.01(1).  The same is true of Iowa, Kansas, and South Carolina.  *See* Iowa Code § 422.7; Kan. Stat. Ann. § 79-32,117(a); S.C. Code § 12-6-40; South Carolina Dep't of Revenue Information Letter 22-14 (Sept. 1, 2022), https://tinyurl.com/3vzwrva2.

130.     Normally, federal adjusted gross income includes student loan discharge.  *See* 26 U.S.C. § 61(a)(11).  Under the American Rescue Plan Act of 2021, however, the discharge of student loan debt is not included in federal adjusted gross income if the discharge occurs between December 31, 2020, and January 1, 2026.  *See* 26 U.S.C. § 108(f)(5).  Thus, student loan debt is

currently not considered taxable state income in Nebraska, Iowa, Kansas, or South Carolina but will be in the future.

131.    There will undoubtedly be student loan debt discharge in the future.  Under federal Income-Driven Repayment (IDR), borrowers receive cancellation after repaying the loans for a certain period of years (20 to 25, depending on the loan).  The Government Accountability Office (GAO) estimates that by 2030, "about 1.5 million loans held by about 600,000 borrowers" will be eligible for loan cancellation.  U.S. Gov't Accountability Office, GAO-22-103720, Federal Student Aid: Education Needs to Take Steps to Ensure Eligible Loans Receive Income-Driven Repayment Forgiveness 15 (2022), https://tinyurl.com/bdhzca8z.  Of those loans, roughly 1.2 million will be forgiven between 2026 and 2030.  *See id.* at 16 fig. 3.  And data from 2021 shows that the average amount of loan cancellation under the program so far has been about "$34,000 per borrower."  *Id.* at 10.  Thus, significant amounts of federal loan cancellation will occur after 2026—including for residents in Nebraska, Iowa, Kansas, and South Carolina.  By operation of law, then, substantial income tax revenue will be coming to Nebraska.

132.    The Mass Debt Cancellation, however, will reduce that tax revenue by decreasing the amount of outstanding student loan debt.  As a result, the Mass Debt Cancellation costs Nebraska, Iowa, Kansas, and South Carolina tax revenue.

**Harms to sovereign and quasi-sovereign interests**

133.    The Mass Debt Cancellation also harms the States' sovereign and quasi-sovereign interests.

134.    For Missouri, because the Mass Debt Cancellation impairs MOHELA's ability to provide student loans to Missouri residents, the Mass Debt Cancellation harms Missouri's sovereign and quasi-sovereign interests in ensuring its citizens receive an education, *see* Mo.

28

Const. art. IX, § 9(b) ("The general assembly shall adequately maintain the state university and such other educational institutions as it may deem necessary."), and the educational well-being of its residents.

135. Because MOHELA performs "an essential public function," Mo. Rev. Stat. § 173.360, interference with the entity's performance of its function impairs its ability to perform an essential public function for the State of Missouri, which impairs the State's sovereign interest in allocating its authority and its sovereign and quasi-sovereign interests in the education of its populace.

136. For Nebraska, because student loan cancellation impairs NIC's ability to provide returns on investments vital to the State, including the State's pensioners, the Mass Debt Cancellation harms Nebraska's sovereign and quasi-sovereign interests in the financial well-being of its residents.

137. For Nebraska, Iowa, Kansas, and South Carolina, the loss of tax revenue impairs their sovereign and quasi-sovereign interests in setting tax policy and, more broadly, in creating and enforcing a legal code. The Mass Debt Cancellation requires Nebraska, Iowa, Kansas, and South Carolina to either forgo future tax revenue or change its tax code to capture the unlawful discharge of student loans.

### Need for Immediate Injunctive Relief

138. ED has announced a definitive and detailed Mass Debt Cancellation program, and it is currently working with student-loan servicers—some of which are state entities such as MOHELA—to set up the infrastructure for the cancellation. These actions are inflicting ongoing irreparable harms on Plaintiff States, as detailed above. Immediate relief is needed to stop these injuries.

139.     The Secretary will imminently issue a waiver or modification under the HEROES Act, and that waiver or modification will exacerbate those injuries and add others.

140.     ED has instructed its loan servicers to have their "initial discharge capability fully operational" by October 1, 2022, just days from now, and the agency announced that its applications for loan cancellation "will be available online by early October 2022," Cancellation Program Webpage, *supra*.  It is likely that the waiver or modification will be published around that time.

141.     Plaintiff States cannot wait to seek relief until after the Secretary publishes the waiver or modification.  The need to act now is exemplified by ED's stated plan to "automatically" cancel loans for the eight million borrowers whose income information the agency already possesses.  *See* Cancellation Program Webpage, *supra*.  ED appears poised to process these automatic cancellations as soon as the waiver or modification is published, effectively denying challengers of its power-grab any chance to obtain injunctive relief before eight million loans are erased.  To prevent this from happening, Plaintiff States must pursue legal recourse now.

## CLAIMS FOR RELIEF

## COUNT ONE - Separation of Powers

142.     Plaintiffs re-allege and incorporate the allegations in the preceding paragraphs of this Complaint.

143.     The Mass Debt Cancellation is a major agency action that could not lawfully be conducted without proper legal authority.

144.     The U.S. Constitution creates a federal government of limited and enumerated powers, and this limitation applies to the Executive Branch.

145.     Any action of the Executive Branch must come from one of two sources of

authority: (1) a valid delegation of authority from a statute enacted by Congress, or (2) a direct exercise of one of the President's enumerated powers in Article II. "The President's power, if any, to issue [an] order must stem either from an act of Congress or from the Constitution itself." *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 585 (1952).

146.    Defendants have not identified a statute that gives them the authority to establish and implement the Mass Debt Cancellation. Despite Defendants' reliance on the HEROES Act, that statute does not provide them any such authority.

147.    To the extent the HEROES Act permits the Mass Debt Cancellation, that statute is unconstitutional.

148.    Accordingly, the Mass Debt Cancellation is an *ultra vires* action and violates the separation of powers.

### COUNT TWO – Violation of the Administrative Procedure Act Exceeding Statutory Authority and Violating the Constitution

149.    Plaintiffs re-allege and incorporate the allegations in the preceding paragraphs of this Complaint.

150.    ED is a federal agency subject to the requirements of the APA.

151.    The Mass Debt Cancellation is final agency action for purposes of the APA.

152.    ED's August 24, 2022 announcement of the Mass Debt Cancellation is final agency action. *See Calvillo Manriquez v. DeVos*, 345 F. Supp. 3d 1077, 1095 (N.D. Cal. 2018) (ED memo and press release "show[ing] that the Secretary made a final decision about how to evaluate claims for borrowers" constituted final agency action).

153.    The Mass Debt Cancellation is a major agency action that could not lawfully be conducted without compliance with the APA.

154.    Under the APA, a reviewing court shall "hold unlawful and set aside agency action"

that is "not in accordance with law," "contrary to constitutional right, power, privilege, or immunity," or "in excess of statutory … authority[,] … limitations, or short of statutory right." 5 U.S.C. § 706(2)(A)–(C).

155. Defendants have not identified a statute that gives them the authority to establish and implement the Mass Debt Cancellation. Despite Defendants' reliance on the HEROES Act, that statute does not provide them any such authority.

156. By exceeding their statutory authority, Defendants have also violated the constitutional separation of powers.

157. To the extent the HEROES Act permits the Mass Debt Cancellation, that statute is unconstitutional.

158. Therefore, the Mass Debt Cancellation is in excess of ED's authority and in violation of the Constitution.

**COUNT THREE – Violation of the Administrative Procedure Act**
**Arbitrary and Capricious Agency Action**

159. Plaintiffs re-allege and incorporate the allegations in the preceding paragraphs of this Complaint.

160. ED is a federal agency subject to the requirements of the APA.

161. The Mass Debt Cancellation is final agency action for purposes of the APA.

162. ED's August 24, 2022 announcement of the Mass Debt Cancellation is final agency action. *See Calvillo Manriquez*, 345 F. Supp. 3d at 1095 (ED memo and press release "show[ing] that the Secretary made a final decision about how to evaluate claims for borrowers" constituted final agency action).

163. The Mass Debt Cancellation is a major agency action that could not lawfully be conducted without compliance with the APA.

164.     Under the APA, a reviewing court shall "hold unlawful and set aside agency action, findings, and conclusions found to be … arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

165.     Agency action is arbitrary and capricious if the agency fails to "examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (cleaned up). "Normally, an agency rule would be arbitrary and capricious if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Id.*

166.     The Mass Debt Cancellation's reliance on the HEROES Act is not the product of reasoned decision-making.  ED had already addressed the potential impact of the COVID-19 pandemic on student loans by pausing loan payments and zeroing interest accrual.  Given that, the agency has not explained why the Mass Debt Cancellation is also needed.

167.     The Mass Debt Cancellation is arbitrary and capricious because ED relied on factors that Congress has not intended it to consider under the HEROES Act.  A senior administration official explained that ED's Mass Debt Cancellation intended to "narrow the racial wealth gap," "promot[e] equity," allow more Americans to obtain "a ticket to a middle-class life" through "post-high school education," and address education costs that have been rising "[o]ver the last 40 years."  Cancellation Backgrounder, *supra*.  None of these are factors that Congress intended the Secretary to consider under the HEROES Act.

168.     The Mass Debt Cancellation is also arbitrary and capricious because ED's

reliance on the pandemic is disingenuous—a mere pretext and *post hoc* rationalization. Shortly before announcing the Mass Debt Cancellation, the Administration had argued in court that the pandemic's impact was now relatively modest. And soon after announcing the Mass Debt Cancellation, President Biden admitted that the pandemic is over. Defendants' reliance on the COVID-19 is plainly and simply a pretext, not the reasoned decision-making required by the APA.

169. The exceedingly broad scope of the Mass Debt Cancellation illustrates its arbitrariness. Betraying its unjustifiably vast scope, the Cancellation is not confined to people who are in "a worse position financially," 20 U.S.C. §1098bb(a)(2)(A), or those whose student loans have been adversely affected by the COVID-19 pandemic.

170. ED failed to address the States' reliance interests, including, but not limited to, States' reliance on stability and volume in the existing FFELP loan market, States' reliance on their income tax structures, and States' reliance in setting up systems to engage in the student loan market, including by providing loans to States' residents for their postsecondary education.

171. For all these reasons and more, the Mass Debt Cancellation is arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with law and must be set aside.

## PRAYER FOR RELIEF

Plaintiffs respectfully ask this Court to:

a. issue an order and judgment declaring that the Mass Debt Cancellation violates the separation of powers established by the U.S. Constitution;

b. issue an order and judgment declaring that the Mass Debt Cancellation violates the APA because it is in excess of statutory authority, is arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with law, and is without observance of procedure required by law;

c.      temporarily restrain and preliminarily and permanently enjoin implementation and enforcement of the Mass Debt Cancellation;

d.      temporarily restrain and preliminarily and permanently enjoin the Secretary from publishing the Mass Debt Cancellation's waiver or modification under the HEROES Act;

e.      set aside the Mass Debt Cancellation;

f.      award Plaintiffs costs and reasonable attorneys' fees, as appropriate; and

g.      grant any other relief the Court deems just and appropriate.

Dated: September 29, 2022

Respectfully submitted,

**DOUGLAS J. PETERSON**
**Attorney General of Nebraska**

*/s/ James A. Campbell*
James A. Campbell
   *Solicitor General of Nebraska*
Office of the Nebraska Attorney General
2115 State Capitol
Lincoln, NE 68509
(402) 471-2686
Jim.Campbell@nebraska.gov
*Counsel for Plaintiffs*

**LESLIE RUTLEDGE**
**Attorney General of Arkansas**

*/s/ Dylan L. Jacobs*
Nicholas J. Bronni
   *Solicitor General of Arkansas*
Dylan L. Jacobs
   *Deputy Solicitor General of Arkansas*
Office of the Arkansas Attorney General
323 Center Street, Suite 200
Little Rock, AR 72201
(501) 682-2007
Dylan.Jacobs@arkansasag.gov
*Counsel for State of Arkansas*

**DEREK SCHMIDT**
**Attorney General of Kansas**

*/s/ Shannon Grammel*
Shannon Grammel
   *Deputy Solicitor General*
Office of the Kansas Attorney General
120 SW 10th Avenue, 2nd Floor
Topeka, Kansas 66612
(785) 296-2215
shannon.grammel@ag.ks.gov
*Counsel for State of Kansas*

**ERIC S. SCHMITT**
**Attorney General of Missouri**

*/s/ Michael E. Talent*
Michael E. Talent, #73339MO
   *Deputy Solicitor General of Missouri*
Missouri Attorney General's Office
Post Office Box 899
Jefferson City, MO 65102
(314) 340-4869
Michael.Talent@ago.mo.gov
*Counsel for Plaintiffs*

**JEFFREY S. THOMPSON**
**Solicitor General of Iowa**

*/s/ Samuel P. Langholz*
Samuel P. Langholz
   *Assistant Solicitor General*
Office of the Iowa Attorney General
1305 E. Walnut Street
Des Moines, Iowa 50319
(515) 281-5164
jeffrey.thompson@ag.iowa.gov
sam.langholz@ag.iowa.gov
*Counsel for State of Iowa*

**ALAN WILSON**
**Attorney General of South Carolina**

*/s/ J. Emory Smith, Jr.*
J. Emory Smith, Jr.
   *Deputy Solicitor General*
Office of the Attorney General of South
Carolina
P.O. Box 11549
Columbia, SC 29211
803-734-3680
ESmith@scag.gov
*Counsel for State of South Carolina*